# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MARIAN OLIVIA WIDENER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 1:18cv00038 |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Marian Olivia Widener, ("Widener"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Widener protectively filed an application for SSI on February 2, 2015, alleging disability as of February 1, 2014,[2] based on depression and anxiety disorder.[3] (Record, ("R."), at 20, 251, 276.) The claim was denied initially and upon reconsideration. (R. at 122-24, 128-30, 133, 136-38, 140-42.) Widener then requested a hearing before an administrative law judge, ("ALJ"). (R. at 143.) A hearing was held on June 22, 2017, at which Widener was represented by counsel. (R. at 37-69.)

By decision dated October 25, 2017, the ALJ denied Widener's claim.[4] (R. at 20-31.) The ALJ found that Widener had not engaged in substantial gainful activity since February 2, 2015, the application date. (R. at 23.) The ALJ determined that Widener had severe impairments, namely bipolar disorder; and depressive disorder with anxiety, but she found that Widener did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20

---

[2] Widener initially alleged an onset date of January 1, 2015, but amended the onset date to February 1, 2014, at her hearing. (R. at 20.)

[3] Widener protectively filed a prior SSI application on October 26, 2011, with an alleged onset date of September 1, 2001. (R. at 80.) This claim was denied initially and on reconsideration. (R. at 80.) By decision dated January 31, 2014, an ALJ denied Widener's claim. (R. at 80-89.) There is no evidence that Widener pursued this claim any further.

[4] Thus, the relevant time period for determining disability is from February 1, 2014, the alleged onset date, through October 25, 2017, the date of the ALJ's decision.

C.F.R. Part 404 Subpart P, Appendix 1. (R. at 23.) The ALJ found that Widener had the residual functional capacity to perform work at all exertional levels, but with the following nonexertional limitations: she can understand, remember and carry out simple instructions in repetitive, unskilled low-stress work; she can attend, persist and concentrate for two-hour intervals with normal breaks, as allowed by the employer, and is able to complete an eight-hour workday; she can have no interactions with the public and only occasional interactions with co-workers and supervisors; she can respond appropriately to supervision, co-workers and usual work situations; and she may have brief moments of heightened symptoms, but not greater than one or two percent of the workday, which can be accommodated during breaks and lunch periods. (R. at 25.) The ALJ found that Widener had no past relevant work. (R. at 30.) Based on Widener's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Widener could perform, including the jobs of an assembler, a folder and an inspector/tester, all at the light[5] level of exertion; and as a furniture assembler, a hand packager and a stock clerk, all at the medium[6] level of exertion. (R. at 30-31.) Thus, the ALJ concluded that Widener was not under a disability as defined by the Act, and was not eligible for SSI benefits. (R. at 31.) *See* 20 C.F.R. § 416.920(g) (2019).

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 416.1567(b) (2019).

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 416.1567(c) (2019).

After the ALJ issued her decision, Widener pursued her administrative appeals, (R. at 208-09), but the Appeals Council denied her request for a review. (R. at 4-8.) Widener then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. See 20 C.F.R. § 416.1481 (2019). This case is before this court on the Commissioner's motion for summary judgment filed June 3, 2019.[7]

## II. Facts

Widener was born in 1962, (R. at 41), which classifies her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). She received her general educational development, ("GED"), diploma, and she has no past relevant work experience. (R. at 42, 252.) At her hearing, Widener stated she was a full-time caregiver for her elderly mother. (R. at 42.) She testified she did everything for her except her personal care, including cleaning, helping with her medications and preparing meals. (R. at 42-43, 45.) Widener stated she was able to handle her own business affairs, had no difficulty driving, could shop independently without difficulty and could concentrate. (R. at 44, 47-48.) She testified she might visit with limited family members, but did not attend any outside organized activities. (R. at 47.) Widener testified she could not work because she lacked mental tolerance or stamina to do anything. (R. at 46.) She stated she had been in mental health treatment for about three to four years and was receiving counseling. (R. at 46, 48.) Widener testified she received treatment approximately every few months, and she denied any hospitalizations. (R. at 48.) She stated she took melatonin and Children's

---

[7] Widener submitted a "Memorandum In Support of Plaintiff's Claim For Social Security Disability Benefits," but did not file a separate motion for summary judgment in this case. (Docket Item No. 14.)

Benadryl for anxiety and sleep. (R. at 46-47.) She stated being around "hyperactive" people weighed on her nerves, and it was easier for her to be in a calm, quiet and serene environment. (R. at 50.) She stated if it was hectic or busy at the grocery store, she could not wait to leave. (R. at 50.) Widener testified she did not like for anyone to hover over her telling her what to do, stating it was easier for her to avoid such situations. (R. at 50-51.) She stated changes irritated her, and she "[would not] tolerate it." (R. at 51-52.) Widener testified she tried to finish tasks, and not being able to do so would irritate her. (R. at 52-53.) When asked about stress, she stated it was easier for her to avoid situations where "something might come up." (R. at 55.)

John Newman, a vocational expert, also testified at Widener's hearing. (R. at 58-66.) Newman testified that a hypothetical individual of Widener's age, education and work history, who could perform work at all exertional levels; who could perform repetitive, unskilled, low-stress work, which was defined as an ability to understand, remember and carry out simple instructions; who could attend, persist and concentrate for two-hour intervals with normal breaks as allowed by the employer; who could complete an eight-hour workday that did not require any interaction with the general public and no more than occasional interactions with co-workers and supervisors; who could respond appropriately to supervision, co-workers and usual work situations; and who may have brief moments of heightened symptoms, but not greater than one to two percent of the workday, which could be accommodated during breaks and lunch periods, could perform jobs existing in significant numbers in the national economy, including jobs as an assembler, a laundry folder and an inspector/tester, all at the light level of exertion. (R. at 59-61.) Newman also testified this hypothetical individual could perform the jobs of a furniture assembler, a hand packager and a stock clerk, all at the medium level of exertion. (R. at 61.) Newman next testified that the same individual, but who would

be off task for 11 to 20 percent of the workday due to mental impairments or symptoms, could not perform any jobs. (R. at 64.) He testified that an individual who would be absent two or more days monthly could not perform any jobs, nor could an individual who was limited to less than occasional interaction with supervisors and co-workers. (R. at 65-66.)

In rendering her decision, the ALJ reviewed records from Christopher Carusi, Ph.D., a licensed clinical psychologist; Southwest Virginia Community Health Clinic; Marcy Rosenbaum, L.C.S.W., a licensed clinical social worker; Melinda Fields, Ph.D., a licensed psychologist; Louis Perrott, Ph.D., a state agency psychologist; and Joseph Leizer, Ph.D., a state agency psychologist.

Widener saw Christopher Carusi, Ph.D., a licensed clinical psychologist, on January 11, 2012, for a consultative examination at the request of Disability Determination Services. (R. at 325-27.) Widener had good grooming and no abnormal movements, and she was cooperative, pleasant and responsive throughout the evaluation. (R. at 325.) She denied taking any medication at that time, and she stated she had never been psychiatrically hospitalized, received counseling or psychiatric treatment. (R. at 325.) Widener reported getting along adequately with teachers and peers, and she denied any school suspensions. (R. at 325.) She testified she had worked in the past cleaning houses, stating "strife and confrontation" was involved at times. (R. at 326.) Widener testified she lived with her mother and their dog, both of whom she cared for. (R. at 326.) She stated she independently performed activities of daily living, and she did housework, including dishes, laundry and most of the cooking. (R. at 326.) For leisure, Widener stated she watched television, talked with her mother and listened to music. (R. at 326.)

On mental status examination, Widener's speech was clear, organized and goal-directed; she was cooperative, responsive and pleasant; her mood was mildly depressed with a broad affect; she was fully oriented; memory was intact; concentration was adequate; overall fund of information was commensurate with her education; ability to think abstractly was below average; she could solve four of four simple mental calculations; repeat a simple phrase; spell "world" forward and backward; and write a simple sentence. (R. at 326.) Widener reported being sad for the nine years since her father's death. (R. at 326.) She denied crying spells, suicidal thoughts and symptoms consistent with mania, hallucinations or paranoia, but she endorsed worrying. (R. at 326.)

Carusi stated Widener gave her best effort, and the results of testing were deemed valid, although her judgment was "somewhat concrete." (R. at 326.) Carusi diagnosed Widener with adjustment disorder with depressed mood, chronic; and he placed her then-current Global Assessment of Functioning, ("GAF"),[8] score at 55.[9] (R. at 327.) He opined she could understand and follow simple and moderately complex directions, but would likely need assistance in understanding more complex directions. (R. at 327.) Carusi also found Widener should be able to get along adequately with others, show up promptly for work and handle work stressors appropriately. (R. at 327.)

---

[8] The GAF score ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health – illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.)

[9] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Widener saw Charise N. Battel, F.N.P., a family nurse practitioner at Southwest Virginia Community Health Clinic, to establish new patient status on September 16, 2014. (R. at 362.) She reported aggravation and frustration, and she stated her life had fallen apart since her father's death. (R. at 362.) Widener stated she was caring for her mother. (R. at 362.) She reported having little interest or pleasure in doing things; feeling down, depressed or hopeless; sleep difficulty; having little energy; having a poor appetite or overeating; feeling bad about herself; and having difficulty concentrating. (R. at 362.) Widener denied having thoughts of harming herself or that she would be better off dead. (R. at 362.) Battel diagnosed depression with anxiety and referred her to behavioral health. (R. at 362-63.)

The same day, Widener saw Marcy Rosenbaum, L.C.S.W., a licensed clinical social worker, for a consultation. (R. at 360.) A depression screening indicated moderately severe depression. (R. at 360.) Mental status examination showed good grooming/hygiene; an anxious mood with congruent behavior; fair insight; pressured speech; flight of ideas and tangential thought processes; no memory problems; no suicidal or homicidal ideations; no evidence of psychosis; and full orientation. (R. at 360.) Rosenbaum provisionally diagnosed a mood disorder, not otherwise specified, and she noted Widener had symptoms of anxiety, depression and bipolar disorder. (R. at 360.) When she returned for cognitive behavior therapy on September 25, 2014, Widener reported a history of some verbal abuse from family members and receiving prior mental health services for one year at Mt. Rogers Community Services Board. (R. at 357.) Her mental status examination was unchanged, except her mood was described as depressed. (R. at 358.) Widener was provisionally diagnosed with bipolar disorder and a need to rule out anxiety disorder, not otherwise specified. (R. at 358.) On September 30, 2014, Widener reported her anxiety continued to be high. (R. at 355.) Mental status examination was the same, except

her mood was described as depressed and anxious; speech was normal, but pressured; and thought processes were coherent, but tangential with flight of ideas. (R. at 355.) Rosenbaum's diagnoses of Widener remained unchanged, and she consulted with her primary care doctor about prescribing BuSpar or Vistaril to assist with her symptoms. (R. at 355.) The same day, Widener saw nurse practitioner Battel and reported her willingness to try BuSpar. (R. at 351.) She appeared anxious with a flat affect and pressured speech at times, but she denied suicidal ideation. (R. at 351.) Battel diagnosed depression with anxiety, and she prescribed BuSpar. (R. at 352.) Widener returned to Battel on October 28, 2014, reporting a slightly improved mood. (R. at 349.) She reported she was taking only half a tablet of the BuSpar at a time, as the entire tablet made her feel sedated the next morning. (R. at 349.) She again denied suicidal or homicidal ideations. (R. at 349.) Widener appeared anxious, and she had pressured speech. (R. at 350.) Battel diagnosed depression with anxiety, and she continued her on BuSpar. (R. at 350.)

Widener continued to treat with Rosenbaum for several more months. On October 30, 2014, she had continued complaints of high anxiety, and she spoke at length about family discord. (R. at 347.) On mental status examination, Widener's mood and affect were depressed and anxious; she had normal, but pressured speech; and thought processes were coherent, but tangential with flight of ideas. (R. at 347.) Rosenbaum continued to provisionally diagnose bipolar disorder, not otherwise specified; and the need to rule out anxiety disorder, not otherwise specified. (R. at 347.) On November 13, 2014, Widener reported being braver than usual. (R. at 345.) Mental status examination remained unchanged, as did Widener's diagnoses. (R. at 345.) On December 1, 2014, Widener reported anxiety, depression, racing thoughts and sleep difficulty. (R. at 343.) On mental status examination, the only change noted was loose associations. (R. at 343.) Rosenbaum diagnosed bipolar disorder,

not otherwise specified, after consulting with a psychiatrist who agreed. (R. at 343.) On January 21, 2015, Widener noted a lot of personal family issues. (R. at 339.) Her mental status examination remained unchanged, and Rosenbaum continued to diagnose bipolar disorder, not otherwise specified. (R. at 339.)

Also, on January 21, 2015, Widener saw nurse practitioner Battel, reporting a stable mood and that BuSpar helped. (R. at 336.) She denied stressors, suicidal ideations and hallucinations. (R. at 336.) Battel diagnosed bipolar disorder, not otherwise specified; and depression with anxiety, and she added Risperdal to Widener's medications. (R. at 337.) On May 6, 2015, Widener stated the Risperdal made her nauseous and jittery, but she stated the BuSpar sometimes helped. (R. at 388.) Widener jumped topics quickly. (R. at 388.) She continued to report family discord, racing thoughts and a hallucination about her sister. (R. at 388.) Widener's mental status and Rosenbaum's diagnosis remained the same. (R. at 388-89.)

On May 6, 2015, Widener saw Stephanie Branham, F.N.P., a family nurse practitioner at Saltville Medical Center, to establish new patient status. (R. at 383.) She diagnosed insomnia and instructed Widener to take melatonin. (R. at 383.) That same day, Dr. Donna Rigolizzo, M.D., saw Widener at Rosenbaum's referral. (R. at 386.) She reported much family stress, but denied feeling depressed. (R. at 386.) Widener said she often was anxious and had erratic sleep and varied appetite, but her energy and motivation were good, and she was able to enjoy some things. (R. at 386.) She denied paranoia, but appeared suspicious of family members. (R. at 386.) Widener denied periods of excessive energy, lack of need for sleep, special powers, impulsive behavior, racing thoughts and rapid or loud speech. (R. at 386.) She stated she found a half-dose of BuSpar helpful. (R. at 386.)

On mental status examination, Widener was alert, neat and clean with good eye contact; she was cooperative and pleasant; she had a fine resting hand tremor bilaterally, but no other abnormal movements; she had a normal gait; normal speech, which was slightly loud, but not pressured; thought processes were coherent and fairly well organized with a tendency to become tangential if not redirected; she had no frank loosening of associations or flight of ideas; she had no overt psychosis; she was possibly paranoid about her family; she denied hallucinations; she had no grandiose delusions; her mood was anxious and depressed; her affect was calm, a bit intense, and she had a dry wit; she was fully oriented with intact memory; she knew recent and remote current events; she had fair insight; and judgment for everyday matters was intact. (R. at 387.) Dr. Rigolizzo diagnosed bipolar disorder, not otherwise specified, which she noted was a provisional diagnosis and based largely on her impression from an assessment from December 1, 2014. (R. at 387.) She noted that, as of the current date, however, Widener was not presenting with enough symptoms or signs of either depression or hypomania for a bipolar disorder diagnosis. (R. at 387.) She recognized a need to rule out paranoid personality disorder, paranoid delusional disorder or schizoaffective disorder based on Widener's statements to Rosenbaum that day endorsing possible psychotic symptoms. (R. at 387.) Dr. Rigolizzo also noted Widener's marked sensitivity to some medications, and she stated if Widener was bipolar, the first priority would be to safeguard her sleep, which would help her maintain or achieve a stable mood. (R. at 387.) She stated, "[a]fter she has a few weeks of good sleep, I would be happy to reassess her and give further recommendations," and she recommended either low-dose temazepam or melatonin. (R. at 387.)

On April 20, 2015, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Widener, finding she

was mildly restricted in her activities of daily living; experienced moderate difficulties maintaining social functioning; experienced mild difficulties maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 96-97.) Perrott opined Widener could understand and remember simple instructions; concentrate and persist at simple tasks; interact appropriately in low-stress relationships; and follow usual work routines, schedules and procedures. (R. at 97.)

Perrott also completed a mental assessment on April 20, 2015. (R. at 98-100.) Perrott opined that Widener's ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (R. at 98-100.) Perrott also stated that Widener was moderately limited in her ability to understand, remember and carry out detailed instructions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 99-100.)

On May 20, 2015, Widener advised Rosenbaum her sister was being "arrogant and overbearing." (R. at 381.) On mental status examination, she was well-groomed with good hygiene; she had a depressed and anxious mood and affect; appropriate behavior and insight; normal, but pressured speech; thought processes that were coherent, but tangential with flight of ideas and loose associations; no memory problems; no evidence of psychosis; no suicidal or homicidal ideations; and she was fully oriented. (R. at 381.) Rosenbaum continued to diagnose bipolar disorder, not otherwise specified. (R. at 381.) Rosenbaum completed a Mental Capacity Assessment form on May 26, 2015, opining Widener was slightly limited[10] in her ability to ask simple questions or request assistance; moderately limited[11] in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; and to be aware of normal hazards and take appropriate precautions; markedly limited[12] in her ability to understand, remember and carry out detailed instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to make simple work-related decisions; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others; and extremely limited[13] in her ability to maintain attention and concentration for

---

[10] A slight limitation is defined on this form as some mild limitation, but the individual can generally function satisfactorily. (R. at 369.)

[11] A moderate limitation is defined on this form as intermittent difficulty, but the individual generally, but not always, can perform satisfactorily. (R. at 369.)

[12] A marked limitation is defined on this form as serious limitation, generally preventing the individual from performing satisfactorily. (R. at 369.)

[13] An extreme limitation is defined on this form as major limitation, resulting in no useful ability to function. (R. at 369.)

extended periods; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday without interruptions from psychologically based symptoms; to perform at a consistent pace with a standard number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 369-71.) Rosenbaum opined Widener would miss four or more days of work in an average month. (R. at 370.) Rosenbaum based her findings on Widener's bipolar diagnosis, interference with understanding and memory due to racing thoughts, flight of ideas, easy distractibility and rapid speech. (R. at 369-71.)

On June 3, 2015, Widener saw Dr. Rigolizzo with continued complaints of anxiety and family stress. (R. at 377.) She reported BuSpar was helping her sleep, and she had cut her melatonin dosage in half. (R. at 377.) Widener stated she was sleeping soundly for four to five hours nightly, and she was pleased with this improvement. (R. at 377.) She again reported good energy and fair motivation, and she denied hallucinations, suicidal or homicidal ideations, periods of sustained racing thoughts, rapid speech, flight of ideas and impulsivity without regard for consequences, and she stated she felt a little calmer overall since her prior visit. (R. at 377.) On mental status examination, she was alert, neat, clean and pleasant with good eye contact; no tremor or abnormal movements; normal speech; no flight of ideas or loose associations and very little tangentiality, and easily directed when that did occur; she denied hallucinations or suicidal or homicidal ideations; her mood was anxious with a mildly anxious affect, but then calm, bright and with good range and appropriate to the context; she was fully oriented with good memory,

concentration and insight; and judgment for everyday matters was intact. (R. at 378.) Dr. Rigolizzo noted Widener was preoccupied with her family's criticism of her. (R. at 378.) She continued to diagnose depression with anxiety; and bipolar disorder, not otherwise specified. (R. at 378.) Dr. Rigolizzo noted, however, as of that day, Widener appeared to be "in remission." (R. at 378.) Specifically, she stated the mild hypomanic symptoms she had weeks previously, may have responded to improved sleep. (R. at 378.) After discussing multiple options with Widener, including anti-depressants, prescription mood stabilizers and fish oil, Widener opted to try fish oil. (R. at 378.) Dr. Rigolizzo also advised her to eliminate artificial sweeteners and processed foods, and she recommended an increased dosage of melatonin, noting seven to eight hours of sleep nightly would help Widener's mood disorder. (R. at 378.)

Also, on June 3, 2015, Widener saw nurse practitioner Branham, noting she was doing well. (R. at 375.) Branham continued to diagnose anxiety disorder, not otherwise specified. (R. at 375.) The same day, she also saw Rosenbaum, noting continued frustration with her sister, who "puts her down." (R. at 373.) On mental status examination, Widener was well-groomed with good hygiene; she had a depressed and anxious mood and affect with appropriate behavior; appropriate insight; normal, but pressured speech; coherent and tangential thought processes; no memory problems; no homicidal or suicidal ideations; no evidence of psychosis; and she was fully oriented. (R. at 373.)

Widener returned to Dr. Rigolizzo on July 15, 2015, reporting continued stressors related to her family's criticisms and differences of opinion. (R. at 412.) She reported improved sleep with melatonin, but noted BuSpar was unreliable for sleep. (R. at 412.) She reported feeling nervous with any change, but she denied

suicidal or homicidal ideation, as well as hallucinations. (R. at 412.) On mental status examination, Widener was alert, neat, clean, pleasant and cooperative with no tremors or abnormal movements; she had a normal gait; speech was normal in rate and volume and not pressured; thought process was logical and organized with no flight of ideas; she had no overt psychosis; her mood was anxious, and her affect was, overall, calm, but intense, and she was nervous when discussing any changes in her medications or supplements until sure she had new instructions clearly written for her; she had good insight; and intact judgment. (R. at 412.) Dr. Rigolizzo diagnosed depression with anxiety, and she increased Widener's dosage of fish oil, which would serve as a mood stabilizer. (R. at 413.) Widener agreed to try a low-dose anti-depressant for anxiety, and Dr. Rigolizzo prescribed sertraline. (R. at 413.) Dr. Rigolizzo also stopped the BuSpar regularly for sleep, but advised Widener to continue taking it on an as-needed basis for her anxiety. (R. at 413.) She advised Widener to take only the melatonin for sleep, increasing the dosage as necessary to get seven to eight hours of sleep nightly. (R. at 413.)

On July 23, 2015, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Widener's SSI claim. (R. at 110-11.) Leizer found Widener was mildly restricted in her activities of daily living, she had moderate difficulties maintaining social functioning, as well as in maintaining concentration, persistence or pace, and she had experienced no repeated episodes of decompensation of extended duration. (R. at 110.) Leizer also found Widener could understand and remember simple instructions; concentrate and persist at simple tasks; interact appropriately in low-stress relationships; and follow usual work routines, schedules and procedures. (R. at 111.)

Leizer also completed a mental assessment on July 23, 2015. (R. at 112-14.) According to Leizer, Widener's ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (R. at 112-13.) Leizer stated that Widener was moderately limited in her ability to understand, remember and carry out detailed instructions, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 112-13.)

Widener saw Branham on August 23, 2016, at which time a depression screening indicated moderate depression. (R. at 410.) Widener skipped from topic to topic very quickly, and she repeatedly talked over Branham when she tried to ask a question or change the subject. (R. at 410.) When asked why she could not work, Widener stated, "I am done dealing with people, and just cannot be around anyone." (R. at 410.) She compared her life to the movie "Carrie," stating her mother was controlling and hated her, as did the kids at school. (R. at 410.) On examination, Widener was in no acute distress. (R. at 411.) Branham continued to diagnose generalized anxiety disorder. (R. at 411.) When she returned on September 16, 2016,

she requested something to help with anxiety. (R. at 408.) Widener, again, was in no acute distress. (R. at 408.) Branham diagnosed anxiety, and she prescribed Effexor XR. (R. at 409.)

On September 20, 2016, Widener advised Rosenbaum her mother was having more health issues, and she was worried about what would happen to her mother and how she would support herself when her mother could not do it. (R. at 405.) She reported doing nothing for enjoyment, she had difficulty dealing with other people, she felt trapped in her family situation, and her "family always put[s] her down." (R. at 405.) Widener stated she did not like loud noises or busy environments, and she did not do well with change, which increased her anxiety and agitated her. (R. at 405.) Rosenbaum listed Widener's "list of assets" to include that she was friendly and had positive relationships with authority figures. (R. at 405.) A depression screening, on which Widener indicated thoughts that she would be better off dead or hurting herself "several days," indicated severe depression. (R. at 405.) Mental status examination showed Widener was well-groomed with good hygiene; a depressed mood/affect with congruent behavior; appropriate insight; rapid speech; thought processes that were coherent, but tangential with flight of ideas; no significant memory problems; no homicidal or suicidal ideations, as well as no evidence of psychosis or worthlessness; and she was fully oriented. (R. at 406.) She diagnosed Widener, provisionally, with moderate, recurrent major depression; and a need to rule out bipolar disorder, unspecified. (R. at 407.)

On October 6, 2016, a depression screen indicated moderately severe depression, but Widener denied suicidal ideations. (R. at 402.) She again advised Rosenbaum she was worried about her mother's health and not having her own income. (R. at 402.) Widener's mental status examination remained unchanged. (R.

at 403.) Rosenbaum diagnosed moderate, recurrent major depression; and she noted Widener also exhibited traits of anxiety and mania. (R. at 403.) Rosenbaum completed a letter that day, at Widener's request, stating Widener could not work an eight-hour day due to her mental health symptoms, noting the most significant symptoms impacting her employment would be her limited social interaction skills and low tolerance for changes in her environment. (R. at 398.) Rosenbaum concluded "she would not be able to maintain employment." (R. at 398.) On November 14, 2016, a depression screening again indicated moderately severe depression. (R. at 399.) Widener reported her Effexor dosage was not helping, and Rosenbaum increased the dosage. (R. at 399.) Widener's mental status examination was unchanged, as were her diagnoses. (R. at 400.)

On March 21, 2017, Melinda M. Fields, Ph.D., a licensed psychologist, completed a psychological evaluation of Widener at the request of the Agency. (R. at 416-20.) She stated she was employed approximately 15 years previously with the Department of Social Services, performing homemaking services for elderly individuals on less than a full-time basis, but left this job because she "didn't want to be around people." (R. at 416.) She denied firings or being disciplined. (R. at 418.) Widener reported worrying, having daily depressed mood, tearfulness, impaired concentration and memory, irritability and being private and withdrawn, but she denied suicidal or homicidal ideation, as well as psychotic processes. (R. at 416-17.) Widener reported her daily activities to include taking care of household chores, including laundry, sharing cooking responsibilities and management of finances with her mother, grocery shopping once or twice monthly, watching television, using the phone "only if necessary," and visiting with her brothers and sister who stopped by weekly. (R. at 417.) She reported good relationships with her mother and brothers, but she stated she did not care if she ever saw her sister again. (R. at 417-

18.) Widener also reported she had been involved in dating relationships previously. (R. at 418.) She denied involvement in church, civic or community activities, and she described her social functioning as "just fine with me." (R. at 417.) Widener again compared herself to the character in the movie "Carrie." (R. at 417.)

On mental status examination, Widener was adequately groomed; she was cooperative and animated; eye contact was adequate; speech was spontaneously generated and coherent, but responses were, at times, irrelevant; there was no evidence of impaired thought process or thought content; there was no evidence of hallucinations or delusions; she had an anxious mood and constricted affect; she was fully oriented; judgment was impaired; immediate and remote memory were normal, but recent memory was impaired, as Widener was unable to recall any of four words after a delay and stated she would be "mad" if Fields told her what they were; insight was fair; concentration was adequate; persistence and pace were within normal limits; and her social functioning appeared impacted by Widener's response style. (R. at 418-19.) Fields diagnosed Widener with major depressive disorder; and autism spectrum disorder, provisional. (R. at 419.) She deemed her prognosis as guarded with appropriate treatment and environmental support. (R. at 419.) Fields concluded Widener's reported depressive symptoms appeared consistent with a major depressive episode, and further assessment was indicated to rule out a diagnosis of autism spectrum disorder with high functioning symptoms. (R. at 419.) Fields stated it was possible Widener would experience an exacerbation of symptoms if faced with stressors typically encountered in gainful employment. (R. at 419.)

Fields also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding Widener was moderately limited in her ability to understand, remember and carry out simple instructions; and to make judgments

on simple work-related decisions; and markedly limited in her ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with the public, supervisors and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 423-25.) Fields noted these findings were based on Widener's impaired recent recall and impaired judgment, as well as her observations leading to a provisional autism spectrum disorder diagnosis. (R. at 424.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2019). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A § 1382c(a)(3)(A)-(B) (West 2012); *McLain*

*v, Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Widener argues that the ALJ erred by failing to properly consider psychologist Fields's opinion, resulting in a residual functional capacity finding that is unsupported by substantial evidence. (Memorandum In Support Of Plaintiff's Claim For Social Security Disability Benefits, ("Plaintiff's Brief"), at 9-14.) Widener also argues that her case was adjudicated by an unconstitutionally appointed ALJ, requiring remand for a new hearing before a different, constitutionally appointed ALJ. (Plaintiff's Brief at 15-18.)

The ALJ found that Widener could perform only simple, repetitive, low-stress, unskilled work that required concentration for no more than two-hour intervals, that required no interactions with the public and no more than occasional interaction with co-workers and supervisors and that allowed her to be off task up to two percent of the workday, which could be accommodated by breaks and lunch

periods. (R. at 25.) The ALJ also found Widener could respond appropriately to supervision, co-workers and usual work situations. (R. at 25.)

As the Commissioner states in his brief, the ALJ thoroughly evaluated the opinion of consultative examiner psychologist Fields, weighed it against the other record evidence and properly according it "some weight." (R. at 29.) First, the ALJ stated Fields's opinion that Widener was markedly limited in her ability to socially interact with others was not supported by her own notes. (R. at 29-30.) Fields reported Widener was cooperative during her examination, and Widener had advised Fields she had good relationships with her mother and her brothers. (R. at 30.) Moreover, the ALJ noted Widener denied a history of firings or other discipline due to an inability to get along with others. (R. at 30.) In any event, the ALJ credited Widener's subjective allegations to the extent they were supported by the evidence, including her statement that she would be "ok" with someone being "in charge," but not "if they are just on you all the time and constantly verbally on you or hovering." (R. at 50-51.) The ALJ accounted for such a limitation in his residual functional capacity finding that limited Widener to the performance of low-stress, repetitive work with no interaction with the public and no more than occasional interactions with co-workers and supervisors.

Widener argues that Fields's opinion is supported by the opinions of Rosenbaum, a licensed clinical social worker who provided cognitive behavioral therapy for Widener. Again, I am not persuaded by this argument. The ALJ accorded Rosenbaum's opinion "limited weight." (R. at 29.) Rosenbaum opined Widener had marked or extreme limitations in the vast majority of all areas assessed and that she would miss about four days of work monthly. Additionally, Rosenbaum authored a letter at Widener's request, dated October 6, 2016, in which she opined Widener

could not work an eight-hour workday due to her mental health symptoms, noting Widener was limited in her ability to interact socially and had a low tolerance for environmental changes. The ALJ found Rosenbaum's opinions were based on Widener's subjective complaints, as they were inconsistent with her own treatment notes. (R. at 29.) More specifically, the ALJ noted that, at multiple appointments, Rosenbaum found Widener had an appropriate mood, coherent thoughts, normal insight and intact memory. (R. at 29.) She noted that such benign findings were inconsistent with Rosenbaum's marked limitations in the ability to complete simple work or extreme limitations in attention. (R. at 29.) Moreover, the ALJ noted there was no evidence to support extreme limitations in social interaction, especially given Widener's good relationship with her mother and brothers, as well as her presentation as cooperative and pleasant with good eye contact. (R. at 29.)

While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 416.927(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence. …" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 416.927(c)(3) (2019).

In his decision, the ALJ stated his residual functional capacity finding was supported by Widener's medical history and daily activities. (R. at 30.) In particular, the ALJ noted his finding that Widener could attend, persist and concentrate for two-

hour intervals was supported by objective evidence of normal concentration, as well as no evidence of psychomotor abnormalities or abnormal pace. (R. at 30.) He stated he had considered evidence of Widener's past conflict with others, social isolation and irritability in limiting her to occasional interaction with co-workers and supervisors and no public interaction. (R. at 30.) In finding she, generally, could respond appropriately to others, the ALJ considered her regular presentation as cooperative and pleasant with good eye contact, as well as her reports of some good family relationships. (R. at 30.)

In addition to the reasoning stated by the ALJ in his decision, I further would note, with respect to Widener's social interaction abilities, that she reported past dating relationships. Also, in September 2016, Rosenbaum listed Widener's "list of assets" to include that she was friendly and had positive relationships with authority figures. With regard to concentration, persistence, pace and attention abilities, Widener reported performing activities, including household chores, cooking, watching television, managing finances, helping manage her mother's medications, shopping in stores, driving and managing her own personal care. At her hearing, she testified she could concentrate. No mention was made in any of the notes that she was late to appointments or did not show up. Widener always presented as well-groomed and with good hygiene. Importantly, she consistently reported being a full-time caregiver for her elderly mother. In March 2017, Fields opined Widener expended adequate effort during the evaluation. Finally, I would reiterate the ALJ's statement that Widener's mental health impairments were treated conservatively. She has never been psychiatrically hospitalized, and, even assuming she has a sensitivity to medications, at times, she opted to try remedies such as fish oil instead of low-dose prescription medications for mood stabilization and melatonin and Children's Benadryl for sleep. When Widener did use prescription medications, she

stated they helped. In September 2014, Widener agreed to try BuSpar, and the following month, she reported a slightly improved mood. In January 2015, she reported a stable mood and that BuSpar helped. In May and June 2015, Widener again noted BuSpar was helpful. Also, in June 2015, she stated she felt a little calmer overall, and Dr. Rigolizzo stated Widener's bipolar disorder appeared to be "in remission," possibly due to improved sleep. In July 2015, Widener noted improved sleep after her melatonin dosage was increased. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Another conservative treatment recommendation that was repeatedly discussed with Widener was good sleep hygiene, which was described as a natural mood stabilizer, as well as the elimination of artificial sweeteners and processed foods from her diet. As the ALJ noted, no "aggressive" treatment was ever recommended by any of the providers contained in the record, and at her hearing, Widener testified she was receiving treatment only "every few months."

The ALJ gave great weight to the opinions of the state agency psychologists, who opined Widener could understand and remember simple instructions, concentrate and persist at simple tasks, interact appropriately in low-stress relationships and follow usual work routines, schedules and procedures. (R. at 28.) As the ALJ noted, such opinions are consistent with the substantial evidence of record, including benign mental status examinations. Moreover, the ALJ noted the state agency psychologists' opinions regarding Widener's social interaction limitations and her ability to perform low-stress work were consistent with her allegations of difficulty communicating with others and becoming irritable when faced with changes in routine. (R. at 28.) Under the regulations, the ALJ is entitled to rely on the state agency psychologists' assessments. *See* 20 C.F.R. §

416.913a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

For all of the above stated reasons, I find substantial evidence supports the ALJ's weighing of the evidence and her ultimate residual functional capacity finding.

Widener also argues that her case must be remanded to a different ALJ because the ALJ who presided over her claim is an inferior officer under the Appointments Clause[14] and was not constitutionally appointed consistent therewith. However, Widener is making this argument to this court for the first time. She did not raise this argument during her initial application for benefits, on reconsideration, during her hearing before the ALJ or before the Appeals Council. In making this argument, Widener relies on the Supreme Court case of *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), in which the Court held that ALJs who presided over the S.E.C.'s enforcement proceedings were "Officers of the United States" within the meaning

---

[14] The Appointments Clause states, in relevant part, that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2.

of the Appointments Clause of the Constitution. The Court also held that, as "Officers of the United States," the S.E.C.'s ALJs were not properly appointed. *See Lucia*, 138 S. Ct. at 2055. The Court further held that the "'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 183, 188 (1995)). The Court stated that such a remedy was appropriate in Lucia's case because he had made a "'timely challenge to the constitutional validity of the appointment of an officer who adjudicate[d] his case.'" *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83). In particular, the Court noted that Lucia contested the validity of the ALJ's appointment before both the S.E.C. and the Court of Appeals. *See Lucia*, 138 S. Ct. at 2055.

Here, the Commissioner does not contest that the *Lucia* ruling applies equally to the ALJs who hear and decide SSA claims for benefits. Nor does the Commissioner contest that the ALJ who decided Widener's case was not, then, properly appointed under the Appointments Clause.[15] Instead, the Commissioner argues that, because Widener did not challenge the validity of the ALJ appointment earlier, she has forfeited this claim. Widener concedes that her Appointments Clause argument was not raised at the ALJ or Appeals Council level. In fact, she admits that this argument was raised in this court for the first time in her brief currently before the court. However, Widener contends that this is the "first opportunity [she] had to

---

[15] In response to the Supreme Court's holding in *Lucia*, the SSA, on July 16, 2018, took remedial action to correct any defect in ALJ appointments. Specifically, on that date, the Acting Commissioner ratified the appointment of ALJs and approved their appointments as her own in order to address the Appointments Clause question involving SSA claims. *See* Emergency Message, EM-18003 REV 2, available at secure. ssa.gov/apps10/reference.nsf/links08062018021025PM (last visited Mar. 23, 2020).

legitimately challenge the appointment of the ALJ," and, therefore, the issue is timely raised under *Lucia*.

As this court previously stated in *Taylor v. Saul*, 2019 WL 3837975, at *5 (W.D. Va. Aug. 15, 2019), numerous district courts have considered Appointments Clause challenges to the validity of SSA decisions denying claims for benefits in the wake of the *Lucia* ruling. Most of the decisions reviewed by the undersigned have found that an Appointments Clause challenge to the validity of an SSA decision is forfeited or waived by the claimant if not raised before the ALJ who heard the case. *See, e.g., Muhammad v. Berryhill*, 381 F. Supp. 3d 462 (E.D. Pa. 2019); *Fortin v. Comm'r of Soc. Sec.*, 372 F. Supp. 3d 558, 562-68 (E.D. Mich. 2019); *Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341 (S.D. N.Y. 2019); *Sprouse v. Berryhill*, 363 F. Supp. 3d 543 (D. N.J. 2019); *Delores A. v. Berryhill*, 2019 WL 1330314 (C.D. Cal. Mar. 25, 2019); *Diane S. P. v. Berryhill*, 2019 WL 1879256 (E.D. Va. Mar. 21, 2019); *Shipman v. Berryhill*, 2019 WL 281313 (W.D. N.C. Jan. 22, 2019); *Iwan v. Comm'r of Soc. Sec.,* 2018 WL 4295202 (N.D. Iowa Sept. 10, 2018); *Abbington v. Berryhill*, 2018 WL 6571208 (S.D. Ala. Dec. 13, 2018); *Nickum v. Berryhill*, 2018 WL 6436091 (D. Kan. Dec. 7, 2018). However, a few have ruled to the contrary. *See Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019); *Bradshaw v. Berryhill*, 2019 WL 1510953 (E.D. N.C. Mar. 26, 2019); *Probst v. Berryhill*, 2019 WL 1749135 (E.D. N.C. Mar. 22, 2019). Several of these cases contain little, if any, analysis of the issue; some even dispense with the issue in a footnote. Of those cases that do contain an analysis of the issue, there is no particular ruling that stands as singularly persuasive. Nonetheless, after considering the collective reasoning of these courts, I am persuaded to hold that a claimant who did not properly raise this issue when her claim was before the ALJ has waived or forfeited any Appointments Clause challenge to the SSA's decision.

The Social Security regulations require an ALJ to identify to a claimant the issues to be decided in a case prior to hearing. *See* 20 C.F.R. § 416.1438(b)(1) (2019). Furthermore, the Social Security regulations require a claimant to file written objections to the ALJ's list of issues to be decided prior to the claimant's hearing. *See* 20 C.F.R. § 416.1439 (2019). The Social Security regulations do not, however, require a claimant to raise a specific issue on appeal of an ALJ's decision to the Appeals Council to preserve that issue for appeal to the district court, and the Supreme Court has refused to impose judicially created issue exhaustion. *See Sims v. Apfel*, 530 U.S. 103, 109-12 (2000). The Court in *Sims*, nonetheless, explicitly noted, "Whether a claimant must exhaust issues before the ALJ is not before us." 530 U.S. at 107. Furthermore, the Court has held that 42 U.S.C. § 405(g) contains a nonwaivable, nonexcusable requirement that a claimant present a claim to the SSA before raising it in a district court. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 15 (2000) (citing *Heckler v. Ringer*, 466 U.S. 602, 622 (1984); *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 763-64 (1975)).

As stated above, the Court in *Lucia* held that a new hearing before a properly appointed official was required only because Lucia had made a timely Appointments Clause challenge to the ALJ who had heard his case. *See* 138 S. Ct. at 2055. Likewise, in *Ryder*, the Court allowed an Appointments Clause challenge to the composition of the Coast Guard Court of Military Review only because the petitioner raised his challenge when he was before the court. *See* 515 U.S. 177, 182-83; *but see Freytag v. C.I.R.*, 501 U.S. 868, 878-79 (1991) (Supreme Court held that Appointments Clause challenge to appointment of a Tax Court special trial judge which was not raised in the courts below, was "one of those rare cases" in which it should exercise discretion to hear the issue). In *United States v. L.A. Tucker Truck*

*Lines, Inc.*, 344 U.S. 33, 38 (1952), the Court held that parties who waited until they were in court to raise a statutory defect in the appointment of an official who issued an agency's decision had, in effect, waived the issue.

Based on the above, I am persuaded that Widener was required to raise her Appointments Clause challenge when her claim was before the SSA. Her failure to do so has resulted in a waiver of that claim on appeal. Nonetheless, there are certain "rare cases" in which a claimant's waiver may be excused. *See Freytag*, 501 U.S. at 878-79. For the reasons that follow, I find that Widener's arguments do not demonstrate that this is such a "rare case." Here, Widener argues that she could not have raised the issue in the administrative proceedings because her request for review of the ALJ's decision was filed with the SSA on November 8, 2017, approximately seven months prior to the *Lucia* decision. This request was, thereafter, denied on August 9, 2018, approximately two months after the Supreme Court issued *Lucia*, and "long after [her] time to submit evidence and arguments to the Appeals Council expired." However, as the court in *Lee v. Berryhill*, 2018 WL 8576604 (E.D. Va. Dec. 20, 2018), *adopted by* 2019 WL 1299366 (E.D. Va. Mar. 21, 2019), found, *Lucia* resolved a circuit split regarding the validity of ALJ appointments. *See Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 673 (6th Cir. 2018) (noting the plaintiff raised the split of authority on the Appointments Clause issue in administrative proceedings); *Page v. Comm'r of Soc. Sec.*, 2018 WL 5668850, at *3 n.4 (E.D. Mich. Oct. 31, 2018) (noting circuit split as recognized in the Tenth Circuit in 2016). Here, Widener's original hearing before the ALJ occurred in June 2017, months after the circuit split had been identified. The ALJ's unfavorable decision was rendered in October 2017; Widener requested review by the Appeals Council in November 2017; Widener's counsel submitted a brief to the Appeals Council in February 2018;

and the Appeals Council denied her request for review on August 9, 2018.[16] This should have permitted her to timely assert the issue in her administrative proceedings. *See Faulkner v. Comm'r of Soc. Sec.*, 2018 WL 6059403 (W.D. Tenn. Nov. 19, 2018) (dismissing *Lucia* challenge because circuit split gave notice sufficient to raise the challenge administratively). Therefore, the fact that the Supreme Court resolved the Appointments Clause issue *after* Widener received a final decision from the Commissioner is insufficient to excuse the forfeiture of this issue on appeal. Additionally, the *Lee* court noted that the *Lucia* opinion is "self-described as an application of *existing* Supreme Court precedent." 2019 WL 1299366, at *2 n.1 (internal quotation marks and citation omitted) (emphasis in original) (citing *Lucia*, 138 S. Ct. at 2053).

---

[16] The record contains a letter from Widener's counsel to the Appeals Council entitled a "Supplemental Brief," which sets forth her Appointments Clause argument. (R. at 3.) However, this letter is dated August 6, 2018, only three days prior to the date on which the Appeals Council rendered its decision denying review, and six months after the initial brief to the Appeals Council was submitted. Counsel offered no reason for such a delayed submission. There is nothing in the record to indicate that the Appeals Council had received this "Supplemental Brief" or considered it in rendering its decision denying review. In fact, it appears this letter was mailed to the Appeals Council in Falls Church, Virginia, either from New York or Florida. Thus, it is very unlikely the Appeals Council had seen it at the time it rendered its decision. Moreover, the Appeals Council sent a letter, dated January 11, 2018, to Widener's counsel, stating it would not act for 25 days of the date of the letter, and, if there was additional evidence he wished to submit, he must do so within 25 days of the letter. (R. at 12.) Additionally, the Appeals Council stated no additional time would be allowed to send information *except for very good reasons*. (R. at 12.) Given Widener's ample opportunities to raise the Appointments Clause issue previously during the administrative proceedings, and given the Appeals Council's express direction that additional evidence must be submitted within 25 days of January 11, 2018, except for very good reasons, I find that the submission of this "Supplemental Brief" in August 2018, which included no explanation at all for its submission approximately six months after the timeframe allowed for additional evidence, does not equate to Widener raising a timely challenge to the appointment of the ALJ who heard her case.

Based on the above, I find that Widener failed to timely raise her Appointments Clause argument, and she has waived that argument on appeal to this court.

For all of the reasons stated herein, I find substantial evidence supports the ALJ's finding that Widener was not disabled and not entitled to SSI benefits. I will grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits. An appropriate Order and Judgment will be entered.

DATED:     March 23, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE